UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10283-RGS

UNITED STATES OF AMERICA

v.

TODD DONOFRIO

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

January 14, 2009

STEARNS, D.J.

Defendant Todd Donofrio challenges the seizure of a firearm and ammunition from the automobile that he was driving on the day of his arrest, July 30, 2007. The vehicle, a 1995 Crown Victoria, was impounded and stored at an FBI garage. Donofrio in the meantime was committed to the Plymouth House of Corrections. The firearm and ammunition were discovered in a concealed compartment behind the back seat of the car during a search of the vehicle on September 5, 2007. The only issue raised by Donofrio's motion to suppress is whether the warrantless search of the Crown Victoria was supported by probable cause. A hearing on the motion was scheduled for December 18, 2008. Immediately prior to the hearing, the government and Donofrio agreed to submit the case to the court on the papers.

APPLICABLE RULES OF LAW

Carroll v. United States, 267 U.S. 132, 158-159 (1925), carved an "automobile exception" out of the Fourth Amendment's warrant requirement. Carroll recognized the

exigency inherent in vehicular mobility as well as the impracticalities involved in obtaining a warrant after a vehicle is stopped. More recent statements of the vehicle exception have emphasized the diminished expectation of privacy afforded by vehicles given their "public" nature and history of invasive regulation by the State. See Cardwell v. Lewis, 417 U.S. 583, 590-591 (1974) (plurality opinion); South Dakota v. Opperman, 428 U.S. 364, 368 (1976); Rakas v. Illinois, 439 U.S. 128, 154 n.2 (1978); California v. Carney, 471 U.S. 386, 392 (1985). "[T]he need to seize readily movable contraband before it is spirited away . . . is equally weighty when the *automobile*, as opposed to its contents, is the contraband that the police seek to secure." Florida v. White, 526 U.S. 559, 565 (1999) (police lawfully seized a vehicle parked in a public place without a warrant having probable cause to believe that it was forfeitable as contraband).

Another important extension of the automobile exception is found in Chambers v. Maroney, 399 U.S. 42 (1970), which held that the existence of exigent circumstances is to be determined at the time the vehicle is seized rather than at the time it is searched. The Court in Chambers found "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search [at the station] without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." Id. at 52.

While the search of an impounded vehicle should be conducted without undue delay, the word "immediate," as used in Chambers, does not mean "instantaneous." See United States v. Johns, 469 U.S. 478, 484 (1985) (three day delay – "no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure");

Cooper v. California, 386 U.S. 58, 61-62 (1967) (permissible one week delay).  See also United States v. Crabb, 952 F.2d 1245, 1246 (10th Cir. 1991) ("[T]ime and opportunity to obtain a warrant are irrelevant, as constitutional analysis ends with finding probable cause.").

The search must be supported by probable cause to believe that the vehicle contains contraband or evidence of a crime; there is no requirement, however, that the search be supported by exigent circumstances.  See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); Maryland v. Dyson, 527 U.S. 465, 466-467 (1999) (per curiam); United States v. Ross, 456 U.S. 798 (1982); Colorado v. Bannister, 449 U.S. 1 (1980).  Cf. Johns, 469 U.S. at 484 (exigent circumstances are not required to search a vehicle lawfully in police custody).  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  Ross, 456 U.S. at 825.  The search may extend to compartments of the car (the trunk, glove compartment, console, and engine area), whether locked or unlocked, and to containers, open or closed, that might conceal contraband or evidence of the suspected crime.  Id. at 817-824.  The search of a vehicle is, however, confined in its intensity by its object.  "Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase."  Id. at 824.[1]

---

[1] The government does not seek to justify the search of Donofrio's vehicle under the inventory search doctrine, which permits police to inventory the contents of an impounded vehicle without probable cause so long as they are acting pursuant to a standardized

## PROBABLE CAUSE

As Donofrio does not dispute the facts presented by the government in its Opposition (which are derived almost entirely from jail house recordings of conversations between Donofrio and his girlfriend and others),[2] the court will summarize the facts on which the government relies.

Donofrio's troubles began in March of 2005 when the FBI began an investigation of illegal drug trafficking by members of the Outlaw Motorcycle Club. Among the techniques resorted to by the FBI was the deployment of undercover officers posing as potential drug suppliers. In short order, a deal for the sale of ten kilograms of cocaine was reached between one of the operatives and Timothy Silvia, a member of the Outlaws' chapter in Brockton, Massachusetts. On July 30, 2007, the day the deal was to be consummated, Silvia was driven to the agreed meeting site by Donofrio in the Crown Victoria. Silvia introduced Donofrio to the undercover officers as his "partner."[3] As FBI agents moved in to make arrests, Donofrio attempted to flee in the Crown Victoria, ramming several FBI cars in the process. When Donofrio refused to exit the vehicle, agents smashed in its windows and forced Donofrio out at gunpoint. The Crown Victoria

---

administrative procedure. See Colorado v. Bertine, 479 U.S. 367 (1987); South Dakota v. Opperman, 428 U.S. 364 (1976).

[2] Donofrio does not dispute the lawfulness of the consensually recorded conversations. See United States v. Lewis, 406 F.3d 11, 16 (1st Cir. 2005).

[3] Donofrio was carrying a bag containing a $30,000 down payment for the ten kilograms of cocaine.

was seized as evidence and stored at an FBI garage. Donofrio was ordered detained at the Plymouth House of Corrections.

The following week, a member of the investigating task force obtained recordings of jail house telephone calls made by Donofrio. In reviewing the conversations, agents heard allusions to what they believed were incriminating items hidden by Donofrio in the Crown Victoria. Among the pertinent excerpts which caught the agents' attention were the following.[4]

On August 1, 2007, Donofrio told his live-in girlfriend, Jennifer Hickey, that his prospects for bail depended on "how fucking good [the agents] were." On August 3, 2007, Donofrio told Hickey, "I had, that ah, what do you call it, I had the dog bones, I had one of them dog collars, that, remember that one I always used to keep like at the seat. . . . in the back."

Later that day, Donofrio told Hickey that he wanted "to know what's up with the car." When Hickey told him that the agents would not release the car to her, he asked, "[W]ill they let you go down and take shit out of it? . . . plates and fucking cds, and ah the fucking um other thing. That's what I'm curious about you know."

The following exchange then took place.

Donofrio: "Do you know why, do you know why ah I'm so concerned about the dog and the car? . . .
Hickey: Yeah, I know why.
Donofrio: Alright. I mean I don't want the fucking dogs to get out (unintelligible) I want to fucking know if everything's okay.

---

[4] A fuller version of the transcripts is set out in Government's Opposition. The orthography follows that of the court reporter. See Govt. Opposition Memorandum, at 12-14.

| | |
|---|---|
| Hickey: | I know why. |
| Donofrio: | Because if they fuck you know, the dog gets out and, um took all my cd's and shit, I'm fucked. |
| Hickey: | I know. . . . |
| Donofrio: | If that's the case I'm maxed out, see you later. |

The next day, Donofrio again pressed Hickey about the car.

| | |
|---|---|
| Donofrio: | I want to know what's wrong with the car. |
| Hickey: | I know. |
| Donofrio: | Once I find that out, I'm all set. I'm either gonna be fucking happy they didn't trash it or I'm gonna be real fucking sick. |
| Hickey: | Huh? |
| Donofrio: | I'm either gonna be happy or gonna be really sick |

. . .

| | |
|---|---|
| Donofrio: | But, see what happens the 14th.[5] But um, so what are you, how are you gonna to take care of that? |
| Santilli:[6] | I will, don't worry about it. |
| Donofrio: | No, but the thing is that, like, I don't know if you talked to Jen about it, like, I'm stressing over this and there's a, there's kind of a reason for it, I just want to know the car's back . . . So, I'm gonna be really happy if they didn't trash my car, and I'll be really upset. |
| Santilli: | I know. |
| Donofrio: | It's one or the other. At the time they didn't, they didn't, you know, obviously at the time they only smashed out all the windows and shit. |

On August 4, 2007, Donofrio, expressing concern that he and Hickey may have "talked too much" on the jail's recorded line and that "if they want to hear this shit they [will] know what's up." He instructed Hickey to have a friend steal the "stuff" from the car.

| | |
|---|---|
| Donofrio: | You know what I was going to tell you seriously, have ah D ah have D go fucking ah go right there. |
| Hickey: | Who? |
| Donofrio: | D. The kid that's got my fuckin' (unintelligible) |
| Hickey: | Oh |

---

[5] August 14, 2007 was the date scheduled for Donofrio's bail hearing.

[6] James Santilli, a friend of Donofrio's, was on the line with Hickey.

| | |
|---|---|
| Donofrio: | have him go there at night fucking ah, grab that stuff |
| Hickey: | Somebody was already gonna do that |
| Donofrio: | At night? |
| Hickey: | Yeah. |
| Donofrio: | You know what I mean, just go there after hours. |
| Hickey: | Yeah, I know |
| Donofrio: | Have Dnuts do it, he's (unintelligible), he's been, he did it with me all of our lives (unintelligible) |

After consulting with an Assistant United States Attorney, on August 27, 2007, agents searched the Crown Victoria without a warrant. They seized a number of CDs and DVDs that on inspection proved non-incriminating. Convinced that something had been missed, on September 5, 2007, agents brought in James Bazzinotti, a State Police Sergeant with an expertise in locating secret car compartments. Behind the frame of the rear seat of the Crown Victoria, Bazzinotti recovered a concealed Bersa .380 caliber handgun loaded with six rounds of ammunition.

## CONCLUSION AND ORDER

Probable cause requires something more than suspicion but something significantly less than evidence necessary to convict. See Henry v. United States, 361 U.S. 98, 100-102 (1959). Probable cause is concerned with probabilities, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949). "The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity." United States v. Ciampa, 793 F.2d 19, 22 (1st Cir. 1986), quoting Illinois v. Gates, 462 U.S. 213, 235 (1983). I agree with the government that Donofrio's own words, recorded in the jail house calls, and interpreted by experienced criminal investigators, see United States v. Arvizu, 534 U.S. 266, 276 (2002), are sufficient in and of themselves to establish probable

cause to believe that incriminating evidence would be found in the impounded Crown Victoria.  Consequently, the motion to suppress must be, and is, <u>DENIED</u>.[7]

                                                SO ORDERED

                                                /s/ Richard G. Stearns

                                                _____
                                                UNITED STATES DISTRICT JUDGE

---

[7] The agents reasonably gleaned from the calls that Donofrio was concerned that if the gun was found he would be denied bail; that he wanted to impress Hickey with the importance of her reclaiming the car; and that when that plan failed, fearing that he had said enough in the calls to give the agents a clue that the car contained hidden evidence, he instructed Hickey to arrange to have one of his friends - D - steal the gun from the car in the garage where it was impounded.